### BLAKE et al. v. SESSIONS et al.

No. 11986—Opinion Filed Oct. 9, 1923.

Rehearing Denied Dec. 4, 1923.

**1. Marriage — Legality — Nature of Contract.**

At common law and under the statute law of Oklahoma, the relation of marriage was and has always been considered as a civil contract, requiring for its consummation, among others, the legal capacity of the persons to contract, and the statute provides that the marriage relation shall only be entered into, maintained, or abrogated as provided by law.

**2. Same — Mixed Marriages — Whites with Negroes.**

The statute law of this state declares that any marriage between any person of African descent with any person not of African descent is unlawful, and expressly prohibits such marriage. Such statute is mandatory and such marriage is void and cannot ripen into a valid marriage, no matter how long continued or maintained, and no right can grow out of such marriage, founded upon the violation of this law.

**3. Same — Power of State to Regulate.**

A state, in the exercise of its sovereign power, has the right to impose upon its citizens an incapacity to contract marriage by means of a positive policy of the state for the protecton of the morals and good order of society against serious social evils, and this law applies to marriages between all citizens alike since statehood was proclaimed, notwithstanding reservations in the Enabling Act, Constitution, or Amendments to the Federal Constitution.

(Syllabus by Thompson, C.)

Commissioners' Opinion, Division No. 5.

Error from District Court, Okfuskee County; Lucien B. Wright, Judge.

Action by W. F. Sessions and Myrtle Segro against W. R. Blake, D. W. Johnston, and E. L. Burden. Judgment for plaintiffs, and defendants appeal. Reversed and remanded.

J. B. Patterson, C. T. Huddleston, and Logan Stephenson, for plaintiffs in error.

Charles Whitaker and Herbert E. Smith, for defendants in error.

Opinion by THOMPSON, C. This action was commenced by defendant in error, W. F. Sessions, against E. L. Burden, W. R. Blake, and D. W. Johnston, plaintiffs in error, by the defendant in error filing his petition in the district court of Okfuskee county, Okla., on the 30th day of December, 1919.

Parties will be referred to as plaintiff and defendant, as they appeared in the lower court.

On the 10th day of March, 1920, plaintiff filed his amended petition, in which it is alleged that some time prior to September 28, 1917, James Grayson and Myrtle McNac, now Segro, became and were husband and wife, under and by virtue of the common law relating to marriages; that James Grayson was a three-fourths blood Indian of the Creek Nation, duly enrolled as such, and had selected as his homestead allotment and had patented to him the northwest quarter of the southwest quarter of section 33, township 11 north, range 11 east, situate in Okfuskee county, Okla., containing 40 acres, more or less; that said James Grayson, while living with Myrtle Grayson as his wife, and while owner and in possession of the lands, died intestate on the 28th day of September, 1917, leavng no issue, father, or mother, but solely and only his said widow, Myrtle Grayson, and his brother, Robert A. Grayson, his sister, Caroline Jones, nee Grayson, Adaline Jackson, his niece, and Edmond Hardridge and Thomas Roberson, his nephews, and that upon his death, Myrtle Grayson, as his widow, became seized of the fee simple title in and to an undivided one-half interest in and to said land, and the other parties, above named, being the remaining heirs of the said James Grayson, became seized of the fee simple title in and to the remaining one-half interest in and to said land; that the plaintiff was the owner of the undivided one-half interest of Myrtle Grayson, same having been conveyed to him by warranty deeds, dated July 20, 1918, and September 25, 1919, copies of which are attached as exhibits; that the defendants are the owners of the remaining undivided one-half interest in and to said premises, as grantees of the said Robert A. Grayson, Caroline Jones, Adaline Jackson, Edmond Hardridge, and Thomas Roberson; that no other parties than those named herein have any interest in said property, and that said property is capable of being divided, and prayed for partition and that plaintiff's interest be

decreed to be an undivided one-half interest in said property, and that the other parties named be declared a one-half interest in the property, and asked for the appointment of commissioners to make partition of the same.

Defendants filed answer and allege that since the — day of — —, 1917, defendants D. W. Johnston and W. R. Blake and their grantee have been in exclusive, open, and notorious possession of the lands sued for in this action, and that plaintiff's grantor was never in possession of the premises at any time during the year next preceding the date of the warranty deeds, sued on in this action, and had taken no rents or profits for the lands for the year next preceding the execution of the deeds, and was not in possession at the date of the execution of the deeds, and that the deeds are absolutely null and void, and that they deny each and every allegation of plaintiff's petition.

Plaintiff filed reply, in terms being a general denial of defendants' answer, and setting up further that Myrtle Grayson is a three-fourths blood Creek Indian, duly enrolled on the rolls of the Creek Nation, and that the lands were allotted lands and were restricted from alienation in the possession of James Grayson, at the time of his death.

Myrtle Segro filed petition in intervention by leave of court, alleging practically the same state of facts as contained in plaintiff's petition and alleging that she and her common-law husband were in possession of the lands at the time of the death of James Grayson; that she had received the rents and profits therefrom within less than one year prior to the making of said deeds to plaintiff; that she disposed of her half interest as the surviving widow of James Grayson, by deeds to plaintiff, and that the interest she claims is to make her covenant of warranty in said deeds good, and prays that her one-half undivided interest be declared to be in plaintiff, and that the same be partitioned in accordance with plaintiff's prayer.

On the 23rd of June, 1920, the cause came on for trial; court refused the demand of defendants for a jury and the case was tried to the court, which trial resulted in judgment in favor of the plaintiff and against the defendants, which judgment was excepted to by the defendants.

Motion for new trial was filed, overruled by the court and exceptions were saved and the cause comes on regularly to this court on appeal by the defendants.

Three grounds are alleged by attorneys for defendants in their assignment of errors, as follows:

"(1) That the findings and judgment of trial court is not supported by the evidence, and is therefore contrary to the law;

"(2) That the trial court erred in denying the defendants (plaintiffs in error) the right of a trial by jury;

"(3) That the court erred in overruling the motion of the defendants for a new trial."

In our view of the case there is but one question necessary to be determined and that question is decisive of this case. The plaintiff, having asserted that he acquired his right, title, and interest in the land under and by virtue of warranty deeds, executed to him by Myrtle Segro, nee McNac, which title was claimed by her as the common-law wife of James Grayson, at the time of his death, and as such, as his surviving widow, obtained title to this one-half undivided interest by inheritance from James Grayson, his cause must stand or fall upon the question of whether his grantor had such title.

The uncontradicted evidence, adduced at the trial is that the alleged marital relations of Myrtle Segro and James Grayson commenced in the month of April, 1916, and that James Grayson was three-fourths Creek Indian and one-fourth negro and these are undisputed and accepted as established facts by all of the parties to this action. The testimony of Myrtle Segro, the intervening plaintiff, who comes into this lawsuit as the grantor of the plaintiff, W. F. Sessions, and for his benefit, as to her blood and racial descent, is as follows:

"Q. Are you a full-blood? A. No, sir. Q. How much? A. Three-fourths. Q. What is the other fourth? A. White, I guess. Q. And three-fourths Indian? A. Yes, sir."

The words "I guess" are written in the typewritten transcript with pen and ink.

At the hearing before the trial judge, at which the stenographer, Sarah L. Baker, who took the testimony of the witnesses down in shorthand and transcribed the same on a typewriter and certified to the correctness thereof in the case-made, that was then being presented for settlement by the trial judge, testified that she had examined her notes the day before this meeting for the settlement of the case-made and that the typewritten copy of this testimony, contained in the case-made, was correct, yet, notwithstanding this testimony of the court reporter, the trial judge ordered that the case-made be corrected and the words "I guess" written therein after the word "white."

The above is all of the testimony upon the disputed question as to whether Myrtle Segro was three-fourths Indian and one-fourth white, preserved in the record, and comes to us in the condition above stated.

The issue in this case is clear cut as to whether or not Myrtle Segro was, or could be, the legal common-law wife of James Grayson. If she were his common-law wife, she inherited this undivided one-half interest claimed by plaintiff. If she were not his legal common-law wife, she could not inherit this undivided one-half interest and the plaintiff has no title.

Section 7488, Comp. Stat. 1921, defines marriage as follows:

"Marriage is a personal relation arising out of a civil contract to which the consent of parties legally competent of contracting and of entering into it is necessary; and the marriage relation shall only be entered into, maintained or abrogated as provided by law."

Under this statute, marriage is defined to be a "civil contract," and contemplates "parties legally competent of contracting and of entering into it," as being necessary before there can be a valid marriage. This is one of the elementary requisites of a civil contract, there must be parties competent to make the contract. The question presented here is whether James Grayson and Myrtle Segro were competent, under the Constitution and laws of this state, to contract and enter into and maintain the marriage relation.

Section 7499, Comp. Stat. 1921, says:

"The marriage of any person of African descent, as defined by the Constitution of this state, to any person not of African descent, or the marriage of any person not of African descent to any person of African descent, shall be unlawful and is hereby prohibited within this state."

The above statute clearly prohibits the marriage between a person of African descent with a person not of African descent and declares the same to be unlawful and expressly prohibits the same within this state. Then, could James Grayson, who was one-fourth negro by descent, and Myrtle Segro, whom the only testimony in the case shows to be three-fourths Indian blood and one-fourth white, legally contract or maintain the marital relation under any form of marriage in this state, is the question to be decided here.

The Constitution of the state of Oklahoma, in two places, undertakes to define what citizens are white and who are colored. Section 3, art. 13, under the head of "Education," in providing for separate schools, uses this language:

"The term 'colored children,' as used in this section, shall be constructed to mean children of African descent. The term 'white children' shall include all other children."

And, under section 11, art. 23, of the Constitution, under the head "Definition of Races," it uses this language:

"Wherever in this Constitution and laws of this state, the word or words 'colored' or 'colored race,' 'negro' or 'negro race,' are used, the same shall be construed to mean or apply to all persons of African descent. The term 'white race' shall include all other persons."

It clearly appears from the above definitions that James Grayson, within the terms of the statute, section 7499, supra, is of African descent, and Myrtle Segro, being a three-fourths Indian and one-fourth white, falls within the above quoted statute defining a person not of African descent, as she is included within the constitutional definition of "all other persons." Then, under the Constitution and statutes above quoted, this marriage, if it had been celebrated and solemnized by all the priests, bishops, ministers, and civil authorities authorized to perform marriage ceremonies in this state, would be within the prohibition of the statutes of this state and unlawful, under the clear and express language of the statutes and the Constitution of this state.

Under the evidence, this relation between James Grayson and Myrtle Segro was entered into by and between them some time in the month of April, 1916, long after the Constitution and law above quoted had been in full force and effect in this state, regulating marriage between citizens of this state, and defining the legal capacity necessary for persons to contract marriage.

We believe that the Constitution and statutes are clear in their meaning, and that the statute, when it says, "The marriage relation shall only be entered into, maintained, or abrogated as provided by law," is mandatory, and the decisions hold that any relation attempted to be contracted in violation of the express provisions of law is absolutely void. This court, in the case of Atkeson v. Sovereign Camp W. O. W. et al., 90 Okla. 154, 216 Pac. 467, in an able opinion by Justice Kennamer, on May 8, 1923, in which, after an oral hearing presented by the best legal talent of the state, a rehearing was denied on July 3, 1923, held in a case involving the marriage of two people out of the state within six months after divorce had been granted to one of the parties, that:

"We believe that these statutes are clear in their meaning and are mandatory. It is our opinion, from these statutes and the controlling decisions in this jurisdiction and others, construing this statute and similar ones, that any marriage attempted to be contracted in violation of the express provisions of the law is absolutely void. Durland v. Durland, 67 Kan. 734, 74 Pac. 274, 63 L. R. A. 959; Niece v. Territory, 9 Okla. 535, 60 Pac. 300; Smith v. Fife, 4 Wash. 702, 30 Pac. 1059, 17 L. R. A. 573; McLennan v. McLennan, 31 Ore. 480, 50 Pac. 802, 38 L. R. A. 863, 65 Am. St. Rep. 835."

In our view of the case it is not necessary that the statute should say that such relations are "void" or "null and void," as contended by attorneys for plaintiff. The statute construed in the case, supra, does not make the marriage entered into within six months after divorce "void" or "null and void," but simply says:

"That the decree does not become absolute or take effect until after the expiration of six months from said time."

And yet this court held that such marriage was void and that Mattie Atkeson could not take insurance on her alleged husband's life, after his death, as his wife, for the sole and only reason that the marriage contracted within the six months after the granting of the divorce in the divorce proceeding between Lee B. Atkeson and Minnie Atkeson was null and void because the same was unlawful and prohibited by the laws of the state and contracted in violation of the express provisions of the law.

It is further contended that the marriage law of the state is not applicable to marriages between citizens of the Creek Nation, and that the Legislature of the state cannot pass any laws regulating marriages between Indians, and asserted as a reason therefor that the United States reserved the right to legislate and regulate marriages between citizens of the Five Civilized Tribes, and that the state statute has no application. This contention cannot be upheld, for the reason that the laws regulating marriages come clearly within the police power of the state and in the exercise of the state's sovereign right, it has the sole and only power within the state to regulate who shall, or who shall not, marry.

Cooley, on Constitutional Limitations, page 557, in a footnote, has this to say:

"It has been decided that state laws, forbidding the intermarriage of blacks and

whites, are such police regulations as are entirely within the power of the states, notwithstanding the provisions of the new amendments to the Constitution."

—and cites numerous authories in support of the above principle.

We believe that there is no well-considered case holding that a state has not the power, in the exercise of its sovereignty, to regulate marriage and impose upon its citizens an incapacity to contract marriage by reason of a positive policy of the state for the protection of the morals and good order of society against serious social evils, and it is our opinion that a marriage contracted in disregard of such a statute is void.

In the Atkeson Case, supra, it is held:

"At common law and under our modern statutes, the relation of marriage was and has always been considered as a civil contract, requiring for its consummation, among others, the legal capacity of the persons to contract."

The above opinion, quoting from the English case of Brook v. Brook, 9 H. L. Cas. 193, 5 Eng. Rul. Cas. 783, says:

"It is quite obvious that no civilized state can allow its domiciled subjects or citizens, by making a temporary visit to a foreign country, to enter into a contract to be performed in the place of domicile, if the contract is forbidden by the law of the place of domicile as contrary to religion or morality, or to any of its fundamental institutions."

And, in the same opinion, the court quotes from Lanham v. Lanham, 136 Wis. 360. 117 N. W. 787, 17 L. R. A. (N. S.) 804, the following language:

"A state undoubtedly has the power to declare what marriages between its own citizens shall not be recognized as valid in its courts, and it also has the power to declare that marriages between its own citizens contrary to its established public policy shall have no validity in its courts, even though they be celebrated in other states, under whose laws they would ordinarily be valid."

In a Georgia case of Scott v. State, 39 Ga. 321 cited in the case of State v. Tutty et al., 41 Fed. 755, it was said, in regard to prohibiting whites and negroes marrying:

"I do not hesitate to say that it was dictated by wise statesmanship, and has a broad and solid foundation in enlightened policy, sustained by sound reason and common sense. The amalgamation of races is not only unnatural but it is always productive of deplorable results. * * * Such connections never elevate the inferior race to the position of the superior, but they bring down the superior to the inferior. They are productive of evil, and evil only, without any corresponding good."

Tennessee, Texas, North Carolina, Georgia, Missouri, Virginia, and every Southern state, and many of the Western states, have similar laws, and while it is true that most of the Legislatures have, by law, declared such marriages "void," or "null and void," yet, in the light of the decision of our court in the Atkeson Case, and on the grounds of a sound public policy, it is our opinion that the marriage relation attempted to be entered into by and between James Grayson and Myrtle Segro, under the laws of this state, was an unlawful relation prohibited by the laws of this state, and is therefore void and no right of inheritance could accrue to Myrtle Segro as the surviving widow of James Grayson, and that she could not inherit the undivided half interest in the lands described in this action, as such marriage is void and not voidable and could never ripen into a valid marriage, no matter how long continued or maintained.

The Supreme court of the United States, in the case of Hall v. Coppell, 7 Wall. U. S. 543-558, Mr. Justice Swayne, in delivering the opinion of the court, said:

"Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation."

Then, under the Constitution and laws of this state and authorities cited in this opinion, it is our opinion that the court erred in pronouncing judgment for the plaintiff in this action, and that the judgment of the trial court should be and is therefore reversed, and the cause remanded, with instructions to grant a new trial.

By the Court: It is so ordered.